James E. Cecchi
Caroline F. Bartlett
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone:  (973) 994-1700
Facsimile:  (973) 994-1744

*Attorneys for Plaintiff and the Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| DOUGLAS ARONSON AND DENISE AARONSON on Behalf of Themselves and All Others Similarly Situated, | Civil Action No.  _____ |
| Plaintiffs, | **CLASS ACTION COMPLAINT AND JURY DEMAND** |
| v. | |
| RIDDELL INC.; ALL AMERICAN SPORTS CORPORATION D/B/A RIDDELL/ALL AMERICAN; RIDDELL SPORTS GROUP, INC.; EASTON-BELL SPORTS, LLC; EB SPORTS CORPORATION, | |
| Defendants. | |

Douglas Aronson and Denise Aronson ("Plaintiffs") bring this action on their own behalf and on behalf of a class of similarly-situated consumers who purchased certain Riddell Revolution football helmets manufactured and marketed by defendants Riddell Inc., All American Sports Corporation d/b/a Riddell/All American; Riddell Sports Group; Easton-Bell, LLC; Easton Bell Sports, Inc. and its subsidiary Riddell Sports Group, Inc., ("Defendants"), on

the false belief that the Revolution football helmets were more effective in preventing concussions.

## INTRODUCTION

1.      Defendants are in the business of designing, manufacturing and marketing a line of football helmets which they claim can actually reduce concussions. Riddell has released three football helmet designs in the past 11 years, starting with its Revolution model, its first helmet designed to "reduce the incidence of concussions."  The next-generation, Revolution Speed came out in 2008 with purportedly improved face-guard protection. The Riddell 360 model made its debut in 2012 and claims to be a better fit and to redirect energy from frontal impacts away from the head.[1]

2.      In fact, Defendants market these Riddell Football Helmets as having "concussion reduction technology" and make other similar marketing and advertising claims regarding the ability of the Football Helmets to provide an increased level of safety through reduced concussions.

3.      In reality, Defendants' promises are illusory and their Football Helmets do not provide the promised concussion reduction results.  In fact, the most recent research has shown that claims of concussion reduction related to football helmets are not valid and are instead unsupportable.

4.      This research shows, for example, that concussion rates remained the same regardless of the type of football helmet used, and that today's football helmets are no better at preventing concussions than the leather football helmets of the past.

---

[1]      The Revolution model, Revolution Speed, and Riddell 360 hereinafter as "Football Helmets."

5.     In the face of this reality, Defendants nevertheless continue to charge a price premium for their Football Helmets in an effort to profit from the increased awareness among consumers over the frequency and effects of concussions.

6.     Plaintiffs bring this lawsuit as a result of these false and deceptive claims of concussion reduction because the Football Helmets they purchased were not worth what they paid for them.   Indeed, despite Defendants' promises of concussion reductions, the Football Helmets are unable to actually reduce concussions.

## JURISDICTION AND VENUE

7.     Subject matter jurisdiction over this action exists according to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because at least one Class member is of diverse citizenship from the Defendants, more than 100 Class members exist nationwide; and the aggregate amount in controversy is greater than $5,000,000.

8.     This Court has personal jurisdiction over the action because Defendants each conduct substantial business in New Jersey and have had substantial and continuous contacts with New Jersey.

9.     Similarly, venue is proper in this District under 28 U.S.C. §1391(a)(2) because a significant part of the events that gave rise to the claim occurred in this District. Plaintiffs purchased the Football Helmets in this District and therefore sustained their injuries in this District and Defendants routinely advertise and sell their Football Helmets in this District. This Court accordingly has jurisdiction over this action and venue is proper in this District.

## THE PARTIES

10.     Plaintiffs Douglas and Denise Aronson reside in Wayne, New Jersey.   They purchased a Revolution football helmet, manufactured, marketed and sold by Defendants.   As a

result of the unlawful conduct alleged herein, Plaintiffs Douglas and Denise Aronson have suffered financial harm or otherwise been injured.

11.     Defendant Riddell, Inc. is a corporation organized and existing under the laws of the State of Illinois and whose principal place of business is in the State of Illinois.  Riddell, Inc. is engaged in the business of designing, manufacturing, selling, and distributing football equipment, including Revolution brand helmets.  Upon information and belief, this Defendant ships its products, including Revolution brand helmets, to direct purchasers and distributors in New Jersey and throughout the United States, sells its products in retail stores in New Jersey and throughout the United States, and advertises its products in New Jersey and throughout the United States.  Riddell, Inc. operates as a subsidiary of Riddell Sports Group, Inc.

12.     Defendant All American Sports Corporation, doing business as Riddell/All American, is a corporation organized and existing under the laws of the State of Delaware and is engaged in the business of designing, manufacturing, selling, and distributing football equipment, including Revolution brand helmets.  Upon information and belief, this Defendant ships its products, including Revolution brand helmets, to direct purchasers and distributors in New Jersey and throughout the United States, sells its products in retail stores in New Jersey and throughout the United States, and advertises its products in New Jersey and throughout the United States.

13.     Defendant Riddell Sports Group, Inc. is a Delaware Corporation with its principal place of business in Irving, Texas.  Upon information and belief, this Defendant ships its products, including Revolution brand helmets, to direct purchasers and distributors in New Jersey and throughout the United States, sells its products in retail stores in New Jersey and nationwide, and advertises its products in New Jersey and throughout the United States.

4

14.     Defendant Easton Bell Sports, Inc. through its subsidiary Riddell Sports Group, Inc., manufactures, markets, advertises, and sells their Riddell Football Helmets throughout the United States.  Defendants are owned by the private equity firm Fenway Partners, Inc.

15.     Defendant Easton-Bell Sports LLC is the parent corporation of Easton-Bell Sports, Inc., and is a Delaware corporation with its principal place of business in New York.

16.     Defendant EB Sports Corporation is a Delaware corporation with its principal place of business in Van Nuys, California.

## FACTUAL ALLEGATIONS

## WHAT IS A CONCUSSION?

17.     A concussion is an injury to the brain that results in temporary loss of normal brain function.

18.      The milder indications of a concussion include headache, lack of concentration, problems with memory and judgment, lack of coordination and difficulty with balance. The more significant effects can include Chronic Traumatic Encephalopathy ("CTE") and Second Impact Syndrome.

19.     CTE is a progressive neurodegenerative disease caused by repetitive trauma to the brain which eventually leads to dementia and other neurological disorders. Second Impact Syndrome is a condition in which the brain swells rapidly after the injured person suffers a second concussion before being able to properly heal from the first, causing substantial injury or death.

20.     The brain has three main parts – the cerebrum controls higher mental functions, such as thought, memory and language; the cerebellum which controls balance and coordination; and the brainstem, which controls bodily function such as breathing, heart rate and blood pressure.

21.     A number of structures surround the brain to keep it safe.  It is encased in the skull to protect it from outside sources, it has supporting tissues to help stabilize it, and it is covered on all sides by three membranes and a layer of fluid.  For this reason, it is often said that the brain "floats" inside the skull.

22.     As a result, injuries to the brain occur when the head suddenly stops moving, but the brain, which was traveling at the same speed as the head, continues to move and strikes the inside of the skull, transferring part of the force to the brain.   This occurs most commonly when a blow is given to the head, and can also occur when the head is forced to accelerate or decelerate rapidly.

23.     Because the brain is soft, when the brain strikes the inside of the skull, it briefly deforms, leading to a concussion.

24.     A common analogy of how to visualize a concussion is to consider an eggshell and a yolk.  The brain as the yolk, nestled in its shell and further protected by the egg white.  When the yolk moves quickly and violently, it smashes into the rigid shell – the same as with the brain inside the skull.

25.     Accordingly, while the shell can be protected with a device that might prevent it from cracking, this device cannot prevent the yolk inside the shell from being shaken.

26.     A concussion is not a structural injury to the brain, but is rather a functional injury. As a result, concussions don't typically show up on MRI or CT scans.

27.     The brain has to be in perfect balance or equilibrium in order to function at its fullest potential.  A concussion results in a disequilibrium, or shift in metabolic need of the brain, which then results in impaired brain function, and causes a variety of immediate symptoms including nausea, blurred vision, amnesia, dizziness and other longer term effects such as permanent brain injury.

28.     According to the CDC, up to 3.8 million people suffer concussions each year, the majority of which occur during competitive or recreational sports.

29.     With respect to concussions in youths, the CDC estimates that more than 170,000 emergency visits in children 18 or younger were attributable to traumatic brain injuries.[2]

**INCREASED AWARNESS OF CONCUSSIONS**

30.     Concussions, and their debilitating effects, continue to receive increasing attention.  Indeed, according to the New York Times, emergency room visits by children and adolescents for brain injuries jumped more than 60% from 2001 to 2009.[3]  The CDC attributes this increase in visits to "the growing awareness among parents and coaches, and the public as a whole, about the need for individuals with a suspected T.B.I. to be seen by a health care professional."

31.     One significant reason for this increased awareness of concussions is due to the overwhelming publicity and media attention on concussions in professional sports, such as the NFL and NHL, and the long-term effects of such brain injuries.

32.     Commensurate with this increased awareness regarding concussions, has been the goal of decreasing the frequency and severity of concussions through education and training. Indeed, the CDC and other health organizations have dedicated websites and other sources of information focused solely on increasing awareness of concussions and their symptoms. Professional sports leagues and other media and entertainment outlets have followed suit.

---

[2]     Centers for Disease Control. Nonfatal traumatic brain injuries related to sports and recreation activities among persons ≤ 19 years - United States, 2001-2009. MMWR 2011;60:1337-1342.

[3]     http://www.nytimes.com/2011/10/07/sports/report-shows-rise-in-er-visits-for-concussions-among-young.html?_r=0

**PROFITING FROM CONCUSSION FEARS**

33.    In order to take advantage of this increased awareness of concussions and their potentially devastating impacts, manufacturers and retailers of sports equipment have sought to profit through the production, marketing and sales of equipment which they claim can actually reduce the frequency and/or severity of concussions.

34.    As part of this scheme to profit from the fear of concussions, Defendants design, manufacture and market their Riddell Football Helmets which they claim to include, *inter alia,* new technologies and designs that can actually reduce concussions.

35.    For example, the Riddell Football Helmets are marketed, advertised and sold as having "Concussion Reduction Technology."   Indeed, Riddell makes the following claims, among others, in marketing its Riddell Football Helmets and their purported concussion reduction technology:

> **Your young athlete will stay protected against impact and concussions with Riddell's® Concussion Reduction Technology due to inflatable S-pads and High-Impact ABS Shell.**

36.    Riddell has made explicit concussion reduction claims, and even promised to provide a "31% reduction in the risk of concussion."



37.     Riddell knows that this study is flawed, is not scientifically supported, and that the FTC concluded that the study "did not prove that Revolution varsity football helmets results concussions or the risk of concussions by 31% . . ." Despite this, and its agreement not to make the specific 31% claim in light of the FTC's investigation, Riddell nonetheless continues to promote its Riddell Football Helmets as having "concussion reduction technology."

38.     Similarly, Riddell routinely presents advertisements promising that its Riddell Football Helmets have superior padding over the "zygoma and mandible region" and therein suggesting better concussion protection:



39.     And in promotional videos touting the technology and safety of their Riddell Football Helmets, Defendants routinely point to specific designs and technological advances that they claim make their helmets safer.   For example, in a four and a half minute video still available on their websites, Defendants explain in detail the technological and design advances that enable their Riddell Football Helmets to reduce concussions.   Indeed, in this video, Defendants state that "on-file reconstructive studies on concussive events showed that many of the players were being struck to the side of the head and the face so we developed our patented side impact protection . . . to better handle those blows to the side of the head and the face."



40.     Defendants further tout their Riddell Football Helmets and market their purported increased safety at marketing events they label as "Protection Tour[s]… a program that delivers expert-driven health and safety education to youth football players, parents and coaches nationwide."   According to Riddell President Dan Arment, "[o]ur expertise in football headgear and protective equipment positions us well to deliver valuable information to youth football players, their parents and coaches about equipment care and fitting at the Protection Tour,"

41.     Commensurate with these concussion reduction promises, are price premiums that Defendants charge for their Riddell Football Helmets.   Indeed, while less expensive products are

readily available, the Riddell Football Helmets are sold at a higher price based on promises of increased safety and reduced concussions. Defendants support this extra cost by pointing to the "technology" of the Riddell Football Helmets and to the results of studies and testing that purportedly demonstrate the effectiveness of the Riddell Football Helmets at reducing concussions.

42.    In their thirst for profits Defendants target their concussion reduction marketing to youth football leagues and high school teams, often offering their Riddell Football Helmets at a discount to high profile high school teams to increase exposure and profits. See, e.g., http://www.northjersey.com/news/Helmets_provide_pricey_peace_of_mind_for_parents_of_youth_football_players.html ("Bergen Catholic's athletic director, Jack McGovern, said the manufacturer offered the school 20 of the new models at a steep discount, in part to get more product exposure.")

43.    Indeed Defendants spend a significant portion of their marketing budgets and advertising dollars on advertising specifically aimed at youth football, hoping to alleviate concerns among parents that participating in football could lead to long-term problems resulting from concussions:



44.     Defendants likewise advertise extensively on social media and elsewhere on the Internet, routinely making the same concussion reduction claims, such as this advertisement on their facebook page:

.



> **Riddell® 360 Youth Helmet | Riddell**
> www.riddell.com
>
> Informed by over 1.4 million impacts collected through Riddell's exclusive HITS™ Technology, the Riddell 360 Youth helmet is the next evolution of Riddell CRT™ (Concussion Reduction Technology). The first helmet design using energy managing materials and a face mask attachment system

45.      As further evidence of this marketing scheme, Defendants' routinely place advertisements in youth focused media, and advertise at youth focused events such as NFL Play 60 Youth Football Clinics.

## CLAIMS OF CONCUSSION REDUCTIONS ARE FALSE AND DECEPTIVE

46.     According to the most recent studies, and the majority of experts, Defendants' claims of concussion reduction are both false and misleading, and their marketing and sales practices promote the false belief that their products are superior at preventing or reducing concussion than less expensive products.

47.     For example, the University of Wisconsin recently released the results of its study, which considered whether a particular brand of football helmet or mouth guard was relatively more effective at reducing concussions.  The results of the study, in which the researchers followed 1,332 high school football players during an entire season, demonstrated that there was no statistically significant difference in the rate of concussions, regardless of the type of helmet used.

48.     The researchers noted that "[d]espite what manufacturers might claim, newer and more expensive equipment may not reduce concussion risk . . .  [s]o is it worth the significant extra cost to families and schools?"[4]

49.     This study found the same was true for the more expensive mouth guards, some of which also make concussion reduction claims:

> There was a surprising safety difference when it came to mouth guards. The data showed that the 39% of players who wore "specialized mouth guards" that were "custom fitted by dental professionals or specifically marketed to reduce" the risk of sports-related concussions were actually 90% more likely to experience a concussion than the 61% of players who used generic mouth guards during the 2012 football season.

50.     Other studies have drawn similar conclusions.  For example, the Cleveland Clinic found that modern football helmets are no better at protecting against concussions than vintage "Leatherhead" football helmets. [5]

51.     The Cleveland Clinic researchers note that:

> helmet safety standards – as measured by the Gadd Severity Index – are based solely on the risk of severe skull fracture and catastrophic brain injury, not concussion risk. So, while modern helmets may prevent severe head injuries, this study found that they frequently did not provide superior protection in typical on-field impacts….The findings suggest that helmet testing should focus on both low- and high-energy impacts, not solely on potentially catastrophic high-energy impacts. This is especially true of youth football helmets, which are currently scaled-down versions of adult helmets. The lack of adequate knowledge surrounding adult helmet protectivity at low-energy impacts, as well as the current absence of any youth-specific helmet testing standards, may have serious brain health implications for the 3 million youths participating in tackle football in the United States each year.

52.     Defendants are aware that their Riddell Football Helmets cannot actually reduce the frequency of concussions.  For example, court documents made public during a Colorado

---

[4]     http://www.latimes.com/science/sciencenow/la-sci-sn-concussion-high-school-football-helmet-mouthguards-20131028,0,7936827.story#axzz2jPcjmzQw
[5]     http://my.clevelandclinic.org/media_relations/library/2011/2011-11-04-vintage-leatherhead-football-helmets-often-as-protective-as-modern-helmets-in-common-game-like-hits.aspx

lawsuit revealed that Biokinetics, a Canadian-based biomechanics firm hired by the NFL, sent Riddell a report in 2000 showing that no football helmet, no matter how revolutionary, could prevent concussions.

53.     Indeed, the issue of false and deceptive marketing claims based on promises of reducing concussions is not new.  For example, the issue has been the subject of repeated investigations by the U.S. Senate and Federal Trade Commission.

54.     Plaintiffs and the members of the putative Class paid price premiums for the Riddell Football Helmets which promised to reduce concussions.  In fact, these Riddell Football Helmets do not and cannot actually reduce concussions and therefore Plaintiffs and the members of the Class were harmed by virtue of their payments of a price premium for these purportedly concussion reduction products.

55.     Accordingly, Plaintiffs assert their class allegations pursuant to Fed. R. Civ. P. 23 against Defendants, and seek claims for violations of the consumer protection laws, unjust enrichment, breach of express and implied warranty and seek monetary and injunctive relief for similarly situated purchasers of Defendants' Riddell Football Helmets.

56.     In reality, no helmet can prevent (or even reduce the frequency of) concussions. Helmets do not and cannot control the force(s) that trigger the brain to accelerate or decelerate within the skull. Such movements of the brain are the main cause of concussions.

## PLAINTIFF'S SPECIFIC FACTUAL ALLEGATIONS

57.     Plaintiffs Douglas and Denise Aronson purchased a Revolution Football Helmet for use by their son in or around August of 2009, based on representations that the Riddell Revolution helmet was superior to other helmets and provided more protection against concussions.  Plaintiffs Douglas and Denise Aronson purchased the Revolution Football Helmet online and paid a price premium for the Riddell Revolution helmet.   Because the Riddell

14

Revolution helmet does not provide greater protection against concussions, Plaintiffs Douglas and Denise Aronson have suffered economic harm.

## CLASS ACTION ALLEGATIONS

58.     Plaintiffs bring this action on behalf of themselves and as a class action under the provisions of Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure. The proposed Class is defined as follows: All purchasers of Riddell Football Helmets within the United States from the beginning of the applicable statute of limitations period through the present.

59.     Excluded from the Class are Defendants, their parent, subsidiaries and affiliates, their directors and officers and members of their immediate families; also excluded are any federal, state or local governmental entities, any judicial officers presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

60.     This action is maintainable as a class action. The Class is so numerous and geographically dispersed that joinder of all Class members is impracticable, and the resolution of their claims as a Class will provide substantial benefits to both the parties and the Court.

61.     A class action is superior to other methods for the fair and efficient adjudication of the claims herein asserted, and no unusual difficulties are likely to be encountered in the management of this class action. Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it unfeasible or impossible for members of the Class to individually seek redress for the wrongful conduct alleged.

62.     Prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

63.     Rule 23(a)(2) and Rule 23(b)(3) are both satisfied because there are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member.  The common questions include, inter alia, the following:

a.     whether Defendants' products can actually prevent or reduce the occurrence of concussions;

b.     whether Defendants concealed the ineffectiveness of Football Helmets in preventing concussions;

c.     whether Defendants had a sufficient basis for their claims concussion reduction;

d.     whether Defendants engaged in unfair, false, misleading, or deceptive acts or practices regarding in the marketing and sale of their Football Helmets;

e.     whether Defendants were unjustly enriched by their claims of concussion reduction;

f.     whether the Class is entitled to injunctive and other equitable relief, including restitution and disgorgement, and if so, the nature of such relief; and

g.     whether the Class is entitled to compensatory damages, and if so, the amount of such damages.

64.     Plaintiffs' claims and the claims of members of the Class all derive from a common core of operative facts.  Further, irrespective of the individual circumstances of any class member, liability in this matter will rise and fall with a relatively few core issues related to Defendants' statements regarding the effectiveness of their Football Helmets at preventing or reducing concussions.

65.     Plaintiffs' claims are typical of the claims of the Class members. Plaintiff has the same interest as all members of the Class in that the nature and character of the challenged conduct is the same.

66.     Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs purchased Football Helmets and paid a price premium for the product based on Defendants' false claims of concussion reduction. Plaintiffs' interests are entirely consistent with, and not antagonistic to, those of the other members of the Class.  Plaintiffs have retained competent counsel experienced in the prosecution of consumer and class action litigation.

67.     Defendants have acted or refused to act on grounds generally applicable to the Class, making injunctive and declaratory relief appropriate with respect to the proposed Class as a whole.

## ASCERTAINABLE LOSS

68.     By reason of the above-described conduct, Defendants caused actual harm, injury-in-fact, and loss of money to Plaintiffs and the Class. Plaintiffs and the Class were injured in the following ways:

a.     Plaintiffs and members of the Class paid price premiums for Defendants' Football Helmets for the purpose of preventing concussions based on Defendants' misrepresentations regarding the helmets' safety features;

b.     If Defendants' Football Helmets were actually capable of reducing the likelihood of concussions as represented, Plaintiffs would not have suffered the damage and economic loss described herein;

c.     Plaintiffs and the Class have been deprived of the cost of their Football Helmets, requiring restitution; and

d.      Plaintiffs and the Class have been deprived of the benefit of their bargains and suffered other damages by purchasing Football Helmets which could not lessen the likelihood of concussions as represented.

## COUNT I
## (VIOLATION OF NEW JERSEY'S CONSUMER FRAUD ACT, N.J.S.A. §58:8-1, *et seq.*)

69.      Plaintiffs repeat the allegations contained in paragraphs 1-68 above, as if fully set forth herein.

70.      Plaintiffs bring this claim individually and on behalf of the other members of a New Jersey subclass.

71.      Defendants misrepresented that the Riddell Football Helmets would provide certain concussion reduction and prevention benefits including, but not limited to Defendants' representations that the Riddell Football Helmets delivered a 31% reduction in the risk of concussions and provided superior anti-concussion support from its concussion reduction technology including padding and side impact protection or provided the other promised concussion reduction and prevention benefits as described herein.

72.      Defendants' affirmative misrepresentations constitute an unconscionable commercial practice, deception, fraud, false promise and/or misrepresentation as to the nature of the goods, in violation of the NJCFA.

73.      Defendants' knowing and intentional omissions as described herein constitute a violation of the NJCFA.

74.      Plaintiffs and the other New Jersey Subclass members suffered an ascertainable loss caused by Defendants' misrepresentations and omissions because they were induced to purchase, or paid a price premium, due to the misleading and false advertising and deceptive

promises of concussion reduction and prevention benefits of the Riddell Football Helmets, when, in fact, those qualities did not exist.

75.     Simply put, Plaintiffs and the other New Jersey Subclass members paid for the advertised benefits of the Football Helmets and did not get what they paid for.

## COUNT II
### (VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT, 815 ILCS 505/1, *et seq.*)

76.     Plaintiffs repeat the allegations contained in paragraphs 1-68 above, as if fully set forth herein.

77.     Plaintiffs bring this claim individually and on behalf of the other members of an Illinois subclass.

78.     The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. 505/1, et seq., prohibits unfair methods of competition and unfair and deceptive acts or practices, including among other things, "the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, . . . whether any person has in fact been misled, deceived or damaged thereby."

79.     Defendants misrepresented that the Riddell Football Helmets would provide certain concussion reduction and prevention benefits including, but not limited to Defendants' representations that the Riddell Football Helmets delivered a 31% reduction in the risk of concussions and provided superior anti-concussion support from its concussion reduction technology including padding and side impact protection or provided the other promised concussion reduction and prevention benefits as described herein.

80.     Throughout the Class Period, Defendants conducted "trade" and "commerce" within the meaning of 815 ILCS 505/1(f) by its advertising, offering for sale, and sale of Riddell Football Helmets.

81. 815 ILCS. 505/1(b) of the Illinois Consumer Fraud and Deceptive Business Practices Act defines the term "merchandise" to include Riddell Football Helmets.

82. 815 ILCS. 505/1(c) of the Illinois Consumer Fraud and Deceptive Practices defines the term "person" to include Defendants.

83. 815 ILCS 505/1(e) of the Illinois Consumer Fraud and Deceptive Practices Act defines the term "consumer" to include Plaintiffs and the other Illinois Subclass members.

84. Defendants' acts and practices, alleged herein, constitute unfair, deceptive, and/or fraudulent business practices in violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, including but not limited to, Defendants' sale of Riddell Football Helmets.

85. Defendant intended for Plaintiffs and Subclass members to rely on its aforementioned deceptive acts and practices, and such deceptive acts and practices occurred in the course of conduct involving trade or commerce.

86. Plaintiffs and the Subclass were exposed to such misrepresentations and were deceived.

87. Defendants' violation of the Illinois Consumer Fraud and Deceptive Business Practices Act caused Plaintiffs and Subclass to sustain substantial and ascertainable losses of money and/or property and other damages because they were induced to purchase or paid a price premium due to the false and misleading advertising and marketing of the Riddell Football Helmets; namely, the promises of concussion reduction and prevention benefits.

## COUNT III
### (UNJUST ENRICHMENT)

88.     Plaintiffs incorporate the allegations set forth in paragraphs 1 through 68 as if fully set forth herein.

89.     Plaintiffs bring this claim individually, as well as on behalf of the members of the nationwide Class, and respectively on behalf of the New Jersey and Illinois Subclasses against Defendants.

90.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and the other Class and Subclass members' purchases of the Football Helmets, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the efficacy of the Football Helmets, which caused injuries to Plaintiffs and the other Class and Subclass members because either they paid a price premium due to the deceptive advertising and false promises of anti-concussion efficacy.

91.     Plaintiffs and the other Class and Subclass members conferred a benefit on Defendants by purchasing one or more of the Football Helmets.

92.     Defendants have been unjustly enriched in retaining the revenues derived from Plaintiffs' and Class and Subclass members' purchases of the Football Helmets, which retention under these circumstances is unjust and inequitable because Defendants misrepresented the efficacy of the Football Helmets, which caused injuries to Plaintiffs and Class and Subclass members because either they paid a price premium due to the deceptive advertising and false promises of anti-concussion efficacy.

93.     Because Defendants' retention of the non-gratuitous benefit conferred on it by Plaintiffs and the other Class and Subclass members is unjust and inequitable, Defendants must

pay restitution to Plaintiffs and the other Class and Subclass members for their unjust enrichment, as ordered by the Court.

WHEREFORE, Plaintiffs pray for relief as follows:

a.      That the Court determine that this action may be maintained as a class action under Rules 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiffs be certified as class representatives and Plaintiffs' counsel be appointed as counsel for the Class;

b.      That the unlawful conduct alleged herein be declared to be illegal and in violation of the state and common law claims alleged herein;

c.      That Plaintiffs and members of the Class recover damages, as provided by law, determined to have been sustained as to each of them, and that judgment be entered against Defendants on behalf of Plaintiffs and members of the Class;

d.      That Defendants be enjoined from engaging in the same or similar practices alleged herein;

e.      That Plaintiffs and members of the Class receive restitution and disgorgement of all Defendants' ill-gotten gains;

f.      That Plaintiffs and members of the Class receive pre-judgment and post-judgment interest as allowed by law;

g.      That Plaintiffs and members of the Class recover their costs of the suit, and attorneys' fees as allowed by law; and

h.      All other relief allowed by law and equity.

Dated: January 8, 2014

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.

By: _____
James E. Cecchi

James E. Cecchi
Caroline F. Bartlett
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700

Jeffrey A. Leon
Jamie E. Weiss
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, Illinois 60035
(847) 433-4500

23

DEMAND FOR JURY TRIAL Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues so triable.

Dated: January 8, 2014

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.

By: _____
          James E. Cecchi

James E/ Cecchi
Caroline F. Bartlett
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744

Jeffrey A. Leon
Jamie E. Weiss
COMPLEX LITIGATION GROUP LLC
513 Central Avenue, Suite 300
Highland Park, Illinois 60035
(847) 433-4500

24